1  Andrew P. Bridges (SBN: 122761)
   abridges@winston.com
2  Jennifer A. Golinveaux (SBN: 203056)
   jgolinveaux@winston.com
3  Matthew A. Scherb (SBN: 237461)
   mscherb@winston.com
4  Winston & Strawn LLP
   101 California Street
5  San Francisco, CA  94111-5894
   Telephone:  415-591-1000
6  Facsimile:  415-591-1400

7  David E. Koropp (*pro hac vice forthcoming*)
   dkoropp@winston.com
8  Winston & Strawn LLP
   35 W. Wacker Drive
9  Chicago, Illinois  60601-9703
   Telephone:  312-558-5600
10 Facsimile:  312-558-5700

11 Attorneys for Defendant
   MICROSOFT CORPORATION

12

13            UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15

16

17 PERFECT 10, INC.,                 )  **Case No. CV07-5156 AHM (SHx)**
                                     )
          Plaintiff,                 )  **MICROSOFT CORPORATION'S**
18                                   )  **MEMORANDUM OF POINTS AND**
                                     )  **AUTHORITIES IN OPPOSITION TO**
19    vs.                            )  **PERFECT 10'S MOTION FOR**
                                     )  **PARTIAL SUMMARY JUDGMENT**
20 MICROSOFT CORPORATION,            )  **AS TO DMCA SAFE HARBOR**
                                     )
          Defendant.                 )  Date: March 23, 2009
21                                   )  Time: 10:00 a.m.
                                     )  Place: Courtroom 14, Courtroom of the
22                                   )  Honorable A. Howard Matz
                                     )
23 _____  )

24

25

26

27

28

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA  94111-5802*

---

1

TABLE OF CONTENTS

2   **I.**    Introduction ............................................................................................. 1

3   **II.**   Factual Background ................................................................................. 2

4          **A.**   Microsoft and Live Search ......................................................... 2

5          **B.**   Microsoft's Copyright Policies Reflect its Strong Respect for
6                 Intellectual Property Rights. ....................................................... 3

7          **C.**   For a Decade, Judy Weston Has Served as Microsoft's DMCA
                   Agent. .......................................................................................... 5

8          **D.**   P10's Purported Troubles Reaching Weston ............................... 5

9          **E.**   Microsoft Processed P10 Communications Expeditiously to the
10                Extent Possible. .......................................................................... 7

11                **1.**   March 26, 2007 Communication to Thomas Rubin ......... 8

12                **2.**   June 7 and 8, 2007 Communications to Weston ............... 8

13                **3.**   July 6, 2007 Letter to Bill Gates .................................... 10

14                **4.**   July 16, 2007 Communication to Weston ...................... 11

15                **5.**   December 26, 2007 and June 2, 2008 Communications ... 11

16                **6.**   December 13, 2008 Email to Weston .............................. 12

     **III.**  Legal Argument .................................................................................... 13
17
           **A.**   Summary Judgment Standard of Review ................................... 13
18
           **B.**   Microsoft's Evidence Supports its Compliance with the DMCA
19                Agent Designation Requirement, and Summary Judgment Against
20                Microsoft on That Ground Would be Inappropriate. ................ 13

21         **C.**   Microsoft Provides Evidence That P10's Communications were
                   Deficient and That Microsoft Acted Expeditiously in Processing
22                Them As Best it Could. .............................................................. 15

23                **1.**   Microsoft Expeditiously Processed All Notices It Received. ....... 16

24                **2.**   There is Evidence That P10's Communications Failed To
                         Comply With DMCA Notification Requirements, and for
25                      That Reason Summary Judgment for P10 is Improper. .............. 17

26         **D.**   Microsoft Needs No Repeat Infringer Policy for Live Search but
                   Has The Requisite Policies in Place. ......................................... 22

27         **E.**   There is At Least a Question of Fact As to Whether Microsoft
28                Qualifies for Section 512(a) Safe Harbor. ................................ 24

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

i

1

**IV.**    CONCLUSION ................................................................................................. 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5802**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................13

*Corbis Corporation v. Amazon.com*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) .......................................................23

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) .........................................................................15

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
462 F.3d 1072 (9th Cir. 2006) .........................................................................13

*Hendrickson v. eBay, Inc.*,
165 F. Supp. 2d 1082 (C.D. Cal. 2001) .....................................................19, 21

*Perfect 10, Inc. v. Amazon.com, Inc.*,
No. 05-4753-AHM, Slip Op. (C.D. Cal. Nov. 4, 2008) ...................................23

*Perfect 10, Inc. v. CCBill*,
488 F.3d 1102 (9th Cir. 2007) ....................................................................passim

*Perfect 10, Inc. v. CCBill, LLC*,
340 F. Supp. 2d 1077 (C.D. Cal. 2004) .....................................................18, 21

*Perfect 10, Inc. v. Visa Intern. Service Ass'n*,
494 F.3d 788 (9th Cir. 2007) ...........................................................................17

*Perfect 10 v. Google*,
Case No. CV04-9484 (C.D. Cal.), Docket No. 42 ...........................................16

*Perfect 10 v. Google, Inc.*,
416 F. Supp. 2d 828 (C.D. Cal. 2006) .........................................................2, 22

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs.*,
351 F.3d 1229 (D.C. Cir. 2003) ..................................................................15, 24

*Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc.*,
524 F. Supp. 2d 1184 (C.D. Cal. 2007) ...........................................................13

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

iii

MICROSOFT'S MPA IN OPP. TO PERFECT 10'S MOT. FOR PARTIAL SUMM. JUDGMENT AS TO DMCA SAFE HARBOR
CASE NO. CV07-5156 AHM (SHX)

STATUTES

17 U.S.C. § 512(i)(1)(A) ................................................................... 24

17 U.S.C. § 512(i)(1)(A) ................................................................... 22

17 U.S.C § 512(a) ...................................................................... 24, 25

17 U.S.C § 512(c)(2) ............................................................ 13, 14, 15

17 U.S.C. § 512(c)(3) ........................................................ 3, 4, 17, 19

17 U.S.C. § 512(c)(3)(A) .................................................... 15, 17, 18

17 U.S.C. § 512(c)(3)(A)(ii) ...................................................... 18, 20

17 U.S.C. § 512(c)(3)(A)(iii) ........................................................... 18

17 U.S.C. § 512(c)(3)(B)(i) ............................................................. 17

17 U.S.C. § 512(c)(3)(B)(ii) ............................................................ 17

17 U.S.C. §§ 512(d)(3) ................................................................... 18

OTHER AUTHORITIES

37 C.F.R. § 201.38 ......................................................................... 15

H.R. Rep. No. 105-551 (II), (1998) ................................................ 15

Rule 56(f) ....................................................................................... 16

S. Rep. No. 105-190 (1998) ............................................................ 15

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## I.    INTRODUCTION

Before any substantive liability issues have been reviewed or ruled upon, Perfect 10 ("P10") brings the present motion and seeks a ruling conclusively barring Microsoft's safe harbor against certain remedies.[1] P10's efforts in this motion to strip Microsoft of its safe harbor fail for numerous reasons:

• Microsoft, as a copyright owner itself, promotes appropriate copyright policies. In the case of Live Search, there are no "account holders" or "subscribers" for whom a repeat infringer policy would apply, but Microsoft generally maintains a repeat infringer policy and a code of conduct for user behavior.

• Microsoft properly designated an agent to receive notifications of infringement under the DMCA. A discrepancy between the fax numbers in the DMCA notification information shown on Microsoft's web site (which was always correct) and in Microsoft's filing with the Copyright Office (which was correct when filed but was updated at some interval after the fax number changed) does not rob Microsoft of safe harbor: all other contact information was correct, fax senders to the outdated number would know the transmission was not successful, the fax number is not statutorily required, and compliance need be only substantial.

• Microsoft diligently and expeditiously processed P10's defective and burdensome notices as well as it could. P10 consistently refused to provide proper notices despite court decisions finding P10's notice practices defective. On several

---

[1] It should not be overlooked when considering the present motion that P10 has tried fervently to trip Microsoft up with a series of extraordinarily burdensome and massively defective "DMCA notices" without taking reasonable steps to cure many defects in its notices or to follow up on its claims that it delivered notices to Microsoft that Microsoft failed to acknowledge or act upon. There can be no doubt that P10 has directed its energy more at establishing a damages claim against Microsoft than at eliminating or reducing infringements that may be available through Live Search. Without a doubt, P10 has been an unusually difficult, noncompliant, and stubborn copyright claimant, unique in Microsoft's experience. But Microsoft is not the only company to face similar challenges dealing with P10: the Ninth Circuit has catalogued many of the same problems with P10's notices in *Perfect 10, Inc. v. CCBill*, 488 F.3d 1102 (9th Cir. 2007). In addition, as shown below, similar discrepancies between Perfect 10's claims to have sent notices and a service provider's lack of receipt exist in the related case involving Google.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

occasions, P10 claims to have sent Microsoft notices that Microsoft's notification agent has no record of receiving:  in any event, the alleged notices were so defective that Microsoft cannot lose safe harbor as a result of them.

The evidence of Microsoft's compliance with DMCA safe harbor conditions undoubtedly raises a genuine issue of material fact to thwart P10's motion; the evidence also establishes the defective nature of P10's notices.  The Court should deny P10's motion for partial summary judgment on safe harbor issues.

## II.   FACTUAL BACKGROUND

### A.   Microsoft and Live Search

In addition to its other businesses, Microsoft is a software publisher and Internet service provider.  It operates Live Search, a search engine that allows anyone to locate web pages, images, and other materials that reside on web servers throughout the World Wide Web.  (Declaration of Steven P. Tapia ("Tapia Dec."), ¶ 2.)

Microsoft Live Search works similarly to how this Court described Google web and image search in *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 832-33 (C.D. Cal. 2006).  To determine what information is available to a user on the Web, Live Search automatically examines the Web with a program called a "crawler."  Live Search indexes almost all the accessible material on the Web in a database that is capable of retrieving the location of particular information on the Web by means of user-instigated queries.  Live Search provides its users two different search products: (a) a search engine for text-based web pages; and (b) a search engine for images. Users input a textual search query, and get hyper-text links that connect them to pages or images on the Web that are most relevant to that query.  Web page links appear as textual URLs along with a brief excerpt from each web page to help the user determine whether to follow the link.  Image links appear as thumbnail versions of the image for the same purpose.  When users click on web or image search results, users cause their browsers to retrieve the original page or image from a third party.  (Tapia Dec., ¶ 4.)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   Microsoft sells advertising space next to text-based web search results.

2   Advertisers choose keywords to help Microsoft associate their ads with particular

3   search queries and choose what they are willing to spend for placement. Microsoft

4   uses an automated process to determine which ads to display in the context of

5   particular web search results.  Microsoft does not display ads with image search

6   results.  (*Id.*, ¶ 6.)

7       **B.    Microsoft's Copyright Policies Reflect its Strong Respect for**

8           **Intellectual Property Rights.**

9       As Microsoft endeavors to index the vastness of the World Wide Web without

10  discrimination, it may inevitably link to some third-party material that the third party

11  is using in violation of copyright laws.  Microsoft built its intellectual property

12  portfolio primarily with products and services protected by intellectual property laws,

13  including copyright laws in the United States and elsewhere.  From its inception,

14  Microsoft has taken extremely seriously any accusation that it enables copyright

15  infringement in any way.  Microsoft devotes substantial resources to handling

16  complaints, including notifications of claimed copyright infringement pursuant to 17

17  U.S.C. § 512(c)(3), contained within the Online Copyright Infringement Liability

18  Limitation Act, part of the Digital Millennium Copyright Act (DMCA).  (*Id.*, ¶ 7.)

19      Microsoft has a dedicated staff and a regular process to handle and respond to

20  DMCA complaints that is available for all to see on Microsoft websites.  While the

21  process is straightforward, some persons do not always provide enough information

22  for Microsoft staff to resolve their DMCA complaint.  Consequently, Microsoft's staff

23  engage in repeated communications with claimants to obtain necessary information.

24  The complaints may also require decisions in light of the applicable laws and

25  Microsoft's policies.  Microsoft never actively or intentionally prevented Live Search

26  users (including copyright owners) from finding or collecting information needed to

27  furnish accurate and complete DMCA notifications.  (Tapia Dec., ¶ 8.)

28      Microsoft considers what processes for handling DMCA notices are needed for

3

1   its products and implements them.  For Live Search, Microsoft will, upon notice,

2   disable links to alleged infringements in web search and image search when a

3   complainant follows DMCA procedures.  Many times, Microsoft will, as a courtesy,

4   act without requiring full compliance with each element of § 512(c)(3).  If a notice is

5   not compliant, and the missing or erroneous information is not easily surmised,

6   Microsoft's usual practice is to request further information.  Its policy is to respond to

7   notifications of claimed infringement expeditiously.  For purposes of customer

8   satisfaction, the goal, met with most complainants, is removal of links or material

9   within 72 hours. (*Id.* ¶10.)

10      Live Search has no subscribers or account holders.  Anyone with Internet access

11   and a web browser may use it without registration, authentication, or provision of

12   identifying information to Microsoft.  Since Live Search has no subscribers or account

13   holders, Microsoft does not have (and could not have) a policy that provides for the

14   termination of subscribers or account holders of Live Search for any policy or legal

15   violation.  Web sites do not subscribe or hold accounts to be in the Live Search index.

16   Although not relevant to this case, Microsoft does have, publicize, and implement a

17   repeat infringer policy for many of its other services that do have subscribers or

18   account holders. (*Id.*, ¶ 11.)

19      Microsoft's Terms of Use make clear that anyone using Microsoft's services

20   may not use them to "make available" infringing materials and that Microsoft has the

21   right to terminate user accounts at any time for this reason or "for any reason

22   whatsoever."  They also state that "if you upload infringing content repeatedly, we

23   will terminate your account and you could face criminal and civil penalties."  The

24   Terms of Use also inform users about Microsoft's DMCA procedures and direct

25   claimants to Microsoft's DMCA policy, available at

26   http://www.microsoft.com/info/cpyrtInfrg.htm.  (*Id.*, ¶ 12, Ex. A.)  Microsoft also has

27   a Code of Conduct for user behavior on MSN and other services that allow users to

28   post content.  It also prohibits persons from using Microsoft's service to violate

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   intellectual property rights, and allows Microsoft to terminate user accounts at will.

2   (*Id.* ¶ 13, Ex. B.)  Microsoft also has a policy to prevent known copyright infringers

3   from purchasing ads by way of AdCenter to promote infringing activities.  (Tapia

4   Dec. ¶ 14.)

5   **C.     For a Decade, Judy Weston Has Served as Microsoft's DMCA Agent.**

6        Judy Weston, also known as J.K. Weston, has been Microsoft's agent for

7   receipt of notifications of claimed infringement under the DMCA at all times relevant

8   to this case.  (Tapia Dec., ¶ 15.)  On January 8, 1999, Microsoft filed its designation

9   naming "J.K. Weston" as its agent.  The version of her name with initials helped

10  separate DMCA-related communications from others she received.  The form also

11  included the company name, a street address, a telephone number, a fax number, and

12  an email address.  All of the information on the form was accurate at the time of

13  filing.  (Weston Dec., ¶ 2; Weston Dep. Tr. at 9:13-15; 15:25-16:2.)

14       Since 1999, Weston has received communications from thousands of DMCA

15  complainants by email, mail, courier, telephone, and fax.  Weston carefully tracks

16  complaints by keeping all incoming communications in email folders named for each

17  complainant.  All correspondence to or from a claimant goes to that folder.  If a

18  communication comes in by fax or mail, Weston scans the document into an email

19  message and places that message in the appropriate folder.  (Weston Dec., ¶ 3, 5.)

20       When a complaint arrives, Weston, with occasional assistance of Microsoft

21  attorneys or technical employees, determines whether Microsoft can process the

22  complaint or needs more information.  If more is needed, she requests it.  If not, she

23  directs a Microsoft employee to remove or disable access as required.  For search

24  complaints, Weston uses an "Exclusion Wizard" tool to communicate removal

25  requests to engineers, or communicates removals directly to engineers by email.  *Id.* ¶

26  6.  For Live Search, Microsoft has blocked access to thousands of URLs.  *Id.* ¶ 4.

27  **D.     P10's Purported Troubles Reaching Weston**

28       Despite others' apparent success reaching Weston, P10 apparently had issues.

5

P10 claims it sent communications to Weston between October 25, 2004 and March 4, 2007 that Weston did not receive. P10 waited until March 2007 to contact Microsoft about the issue, at which time Microsoft addressed P10's concerns. *Id.* ¶ 7. (In any event, a review of Ex. 9 to Zada Dec. now shows the purported missing communications failed to comply with DMCA notice requirements.) On March 27, 2007, Thomas Rubin of Microsoft received a communication from P10 claiming that for several years P10 had been unable to fax materials to Weston at the number listed on Microsoft's 1999 designation form, (425) 936-4112. During that time, Microsoft had posted a new, correct fax number at the DMCA notification information section of its website. Apparently, P10 never called Weston to discuss the matter before contacting Rubin. (Weston Dec. ¶ 7.) P10 threatened litigation in that first communication to Rubin.

The fax number (425) 936-4112 stopped being associated with Microsoft after 2003 after Microsoft underwent a large-scale reassignment of phone numbers. As 425-936-4112 was no longer associated with Microsoft, it no longer operated as a fax number, and attempted fax transmissions to that number would have failed. (Weston Dec. ¶ 8.) When the fax number changed, Microsoft changed the contact number it posted in its Terms of Use. Only the fax number in the Copyright Office filing became wrong. (Weston Dec. ¶ 7.) P10 knew for years that its faxes were not reaching Microsoft. Two "Transmission Verification Reports" from December 8, 2005 stated "BUSY/NO RESPONSE" and have a notation "wrong number; message disconnected." P10 never called to report any problems; Weston first learned about the issue from P10's March 26, 2007 letter. (*Id.* ¶ 9 and Ex. A) On March 29, 2007, just two days after receiving P10's communication about the fax number issue, Microsoft amended its agent designation in the Copyright Office to show the new, correct fax number (*Id.*, ¶ 10.)

P10's March 26, 2007 letter to Rubin also indicated that it had received no response to emails it purportedly sent to Weston at jkweston@microsoft.com, which,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

6

1    at all times relevant, has been Weston's exclusive email address for receipt of DMCA

2    notifications. Weston has reviewed all of the email associated with that email address

3    for the days on which P10 claims it sent emails to her that went unacknowledged. She

4    received numerous emails, but not from P10, on each of those days. (*Id.*, ¶¶ 12-13,

5    Ex.B.)

6        Microsoft maintains its own email servers. If they receive an email, they either

7    deliver it to the appropriate addressee or generate an error message to the sender

8    called a "bounceback." Emails with excessively large attachments and even spam

9    generate bounceback messages. If an email goes to an employee's computer, it either

10   goes into an inbox or a junk folder. (LeClair Dec. ¶ 2.) Weston reviewed everything

11   that came to the jkweston@microsoft.com email account, including mail in junk

12   folders. She never deleted complaints manually and she never set up a rule or filter to

13   delete messages automatically. She examined the folder that she keeps for P10 and

14   searched the jkweston@microsoft.com email account for P10 email, but could locate

15   no communications from P10 before Microsoft's receipt of P10's March 26, 2007

16   communication. She received none. (Weston Dec. ¶ 14.)

     **E.    Microsoft Processed P10 Communications Expeditiously to the**
17
     **Extent Possible.**
18

19       After receiving P10's complaints about the apparent email and fax issues,

20   Microsoft processed several P10 communications. From March 26, 2007 onward,

21   Microsoft did so under threat of, and during, litigation. The litigation threat alone

22   made the relationship with P10 unusual, but it was also unusual because: (1) each

23   communication referred to an enormous amount of data on DVDs and a hard drive; no

24   other claimant deluged Microsoft in this way; (2) P10 insisted that Microsoft take

25   action in ways no other complainant demanded; and (3) P10 remained unwilling to

26   assist Microsoft in processing its complaints. All these factors required Microsoft to

27   spend significant time and resources handling each notice. (*Id.* ¶ 15.) Nonetheless,

28   Microsoft promptly processed these P10 communications.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

7

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

### 1.    March 26, 2007 Communication to Thomas Rubin

P10 sent Thomas Rubin, Associate General Counsel of Microsoft, a letter dated March 26, 2007 by FedEx and a duplicate email dated March 27, 2007.  The letter did not claim to be a DMCA notice and P10 did not send it to Weston, Microsoft's DMCA agent.  The letter lacked key components that the DMCA requires: sworn statements about ownership and consent to jurisdiction, and identification of works or links to specific infringing material.  The letter did not request the removal of works, but threatened litigation.  The letter referred to two disks containing about 7,000 files, many of which were lengthy pdfs.  (*Id.,* ¶ 17, Ex. A at 5.)

On March 27, 2007, Rubin forwarded the email to others on the Microsoft legal team, including Weston.  Microsoft, as the letter requested, had a conference call with P10.  After a conversation on April 16, 2007, Zada sent a test email to Weston's jkweston@microsoft.com account, and Weston confirmed that email came through without a problem.  (*Id.* ¶ 18, Ex. D.)  P10 and Microsoft continued to exchange communications and to have phone conversations in May and June 2007.  Then, in early June of 2007, P10 sent more communications styled as DMCA notices. Microsoft and its counsel decided to address the March and June communications together.  (*Id.* ¶ 21.)

### 2.    June 7 and 8, 2007 Communications to Weston

P10 sent communications dated June 7 and 8, 2007 to Microsoft's DMCA agent.  Microsoft received the Friday, June 8, 2007 communication (with one disk) on Monday, June 11, 2007 and it was promptly routed to Weston.  Upon reading the June 8 communication, Weston realized it referred to a June 7 communication that she had not yet received.  She informed P10.  After a few exchanges of information with P10, Weston was able to locate the package at Microsoft.  The mailroom had made an error in routing the package that delayed its delivery.  Weston located the package (with a letter and additional disks) on June 18, 2007.  The disks accompanying the June 7 and 8, 2007 communications contained over 21,000 files.  (Weston Dec. ¶ 20, Ex. E.)

8

Microsoft's counsel sent a letter to P10 explaining its position on P10's March 26, 2007 and June 8, 2007 communications.  (*Id.* ¶ 21, Ex. F.)  The letter walked P10 through deficiencies in its notices, telling P10 Microsoft could help, but only if P10 provided "(i) a specific URL, (ii) the search term used to verify it was Microsoft's Live Search results (as opposed to search results produced by searching on a third party website with that party's search tools) that retrieved the URL, and (iii) verification of copyright ownership."  The letter also pointed out that P10's demand to remove links to the homepages of third-party Usenet websites such as giganews.com was untenable.  (*Id.*)  The home pages contained no infringing material.  P10 was asking Microsoft to pay to join giganews.com and similar sites and search for the allegedly infringing works *on that site, not on Live Search*.  Meanwhile, P10 then, and now, presents no evidence that giganews.com is devoted to infringement generally, let alone to infringement of P10's copyrights.  In fact, giganews.com, and sites like it, provide legitimate access to vast amounts of news, discussions, and user-created materials.  (Dec. of Andrew P. Bridges, ¶ 8 & Ex. G.)

For the June 7, 2007 communication, Microsoft summoned a team to evaluate the letter and the two separate disks to determine what, based on the communication, Microsoft could remove from its search index.  Microsoft learned that some folders did contain files that listed specific image or webpage URLs alongside alleged infringements that had been located through a Live Search query.  Although these files were separate from the June 7, 2007 communication, and although they did not identify P10's claimed works, Microsoft nonetheless processed these folders and identified links it could purge from Live Search.  (Weston Dec. ¶23.)

Microsoft removed a large number of links: 580 image search links, plus web search links reflected in over 50 pages of printouts recording the removals based on the June 7, 2007 communication.  Since 2006, Microsoft has regularly recorded web search removals in a database.  Each removal event has a "bug" number to identify it.  P10 bugs for the June 7, 2007 notice are attached to the Weston Dec., ¶ 24 & Ex. G.

9

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    Notably, the database reports show that Microsoft removed the links in Ex. 17 to the

2    Zada Declaration.  Zada complains that Microsoft left these links alone.  (Zada Dec. ¶

3    13-14.)  He is wrong.

4          While some folders contained information upon which Microsoft could act,

5    other folders did not.  Some folders contained images from third-party websites

6    lacking URLs or lacking other reasonable means of blocking the images from search

7    results (short of disabling entire websites).  (Dec. of John C. Donaldson, ¶ 2 & Ex. A.)

8    Others contained search results showing passwords (which are not copyrighted) or

9    banner advertisements for Live Search next to allegedly infringing images hosted on

10   third-party websites.  This information did not allow Microsoft to remove links in

11   Live Search.  (Weston Dec. ¶ 25.)   Moreover, neither the June 7 nor June 8

12   communications told Microsoft which P10 works were allegedly infringed by which

13   images.  They identified copyrighted works only by saying that they appeared on the

14   perfect10.com website, for which Zada would provide a subscription upon request.

15         On June 28, 2007, Microsoft's outside counsel wrote to P10, explaining first

16   that the June 7, 2007 communication contained some information that Microsoft could

17   act upon, and that Microsoft "has severed links to hundreds of images and is in the

18   process of continuing to sever additional links."  The June 28 letter also informed P10

19   that other information in the June 7 communication was deficient and did not permit

20   Microsoft to act.  (Weston Dec., ¶ 26 Microsoft again wrote to P10 on July 16, 2007

21   with a list of 518 webpage and image links that it had already disabled and informed

22   P10 that additional removals might be forthcoming.  (*Id.* ¶ 27

23              **3.     July 6, 2007 Letter to Bill Gates**

24         P10's next move was to send a threatening letter to Bill Gates and other

25   Microsoft executives, not to Weston, Microsoft's DMCA agent, on July 6, 2007.

26   (Weston Dec., ¶ 28, Ex. J.)  Like the March 26, 2007 communication, it lacked

27   required elements of a DMCA notice: there was no sworn statement about ownership

28   and consent to jurisdiction, and no identification of works or links to specific

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

10

1    infringing material.  Again, the letter did not request the removal of works, but

2    threatened litigation and sought settlement.  (*Id.*)

3            **4.      July 16, 2007 Communication to Weston**

4            On Friday August 3, 2007, Microsoft received by FedEx, and on Monday,

5    August 6, 2007 Weston received, P10's communication dated July 16, 2007.

6    Although dated July 16, 2007, the FedEx communication shows that P10 dispatched it

7    on August 2, 2007.  (Weston Dec. ¶ 29, Ex. K.)

8            The July 16, 2007 communication came with a hard drive and a DVD. The hard

9    drive had 1.1 million image files and a maze of folders and pdf files; the DVD had

10   1,214 files in 378 folders and over 1.7 GB of data.   The hard drive contained

11   allegedly infringing images from Usenet sites, material Microsoft could not use to

12   take any action with respect to Live Search because it identified no infringing links

13   available through it.  In addition, the hard drive and DVD contained folders called

14   ALL ARE P10, ALL LARGE ARE P10, ALL LARGE WITH P10 NOTICES, and

15   CHECKED ARE P10 with voluminous printouts from third party websites and, in

16   some cases, search results not from Live Search, *but from Google.*  (Donaldson Dec. ¶

17   3 & Ex. B.)  There was no indication that P10 located the images through Microsoft's

18   search engine, and whether P10 wanted removals from web search or image search.

19   The July 16, 2007 communication, as earlier ones, made no attempt to identify the

20   P10 work corresponding to any allegedly infringing image.  It identified P10

21   copyrighted works only generally in a folder on the hard drive and by saying that

22   P10's images were on the perfect10.com subscription website.  (Weston Dec. ¶ 30.)

23           **5.      December 26, 2007 and June 2, 2008 Communications**

24           Since this litigation began in August of 2007, P10 has sent three new DMCA

25   notices.  Two are very similar.  P10 sent one on the day after Christmas in 2007 and

26   another on June 2, 2008.  (*Id.*, ¶ 31.)

27           Microsoft expeditiously reviewed these communications.  Both

28   communications referred to two DVDs.  The disks accompanying the December 26,

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5802**

11

1   2007 notice contained over 18,000 files, about 1,100 of which were pdfs, many with

2   hundreds of pages.  The disks with the June 2, 2008 communication contained over

3   15,000 files, over 200 of which were pdfs, many with hundreds of pages.  Each time

4   one DVD depicted alleged infringements from third-party Usenet sites with no URLs

5   and asked Microsoft to investigate infringement on those Usenet sites.  Each time

6   another DVD contained a hodgepodge of hundreds or thousands of files (with many

7   thousands of pages) contained in over 175 folders organized at different levels.  They

8   mixed images of Microsoft web search results with allegedly infringing images from

9   third-party websites with no correspondence to search results.  (Donaldson Dec. ¶ 4 &

10   Ex. C.)   Many items did not appear to correspond to search result printouts contained

11   elsewhere.  A number, based on random sampling, did not even appear to occur in

12   Microsoft's search index.  Microsoft was unable to discern what specific URLs P10

13   desired Microsoft to remove and whether P10 was complaining about web search

14   results, image search results, or neither.  It appeared that that P10 was again asking

15   Microsoft to exclude a series of entire websites.  (Weston Dec. ¶ 32.)  As earlier, P10

16   failed to correlate alleged infringements with any of its particular works.

17        Microsoft informed P10 it was unable to process its Dec. 26, 2007 and June 2,

18   2008 communications.  It reminded P10 that "valid notifications of claimed

19   infringement must identify the references or links that the tool provides to infringing

20   material.  It is not enough to simply parade alleged third-party infringements."

21   Microsoft offered to work with P10 if it would forsake its cumbersome and defective

22   notices in favor of a simpler format that would serve everyone's interests.  P10

23   declined.  Despite some further exchanges between counsel, P10 refused to budge.

24   (Bridges Dec. ¶ 3.)

25            **6.       December 13, 2008 Email to Weston**

26        P10 sent its latest communication to Weston on December 13, 2008.  Although

27   styling itself a DMCA notice, the communication asks questions of Microsoft rather

28   than requesting action.  (Weston Dec. ¶ 35.)  In its motion, P10 inexplicably neglected

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

12

to mention this communication or Microsoft's response.  Microsoft blocked a number of webpage and image URLs over the Christmas holiday.  (*Id.*)  On January 13, 2008, Microsoft informed P10 that, despite various shortcomings in the communication, Microsoft had blocked these various resources.  (Bridges Dec. ¶ 4.)

## III.   LEGAL ARGUMENT

### A.   Summary Judgment Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact, and only if the evidence is so one sided that one party must prevail as a matter of law. *See Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (internal quotation marks omitted) (quoting and citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  Inferences from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc.*, 524 F. Supp. 2d 1184, 1187  (C.D. Cal. 2007).

### B.   Microsoft's Evidence Supports its Compliance with the DMCA Agent Designation Requirement, and Summary Judgment Against Microsoft on That Ground Would be Inappropriate.

P10 argues that undisputed facts pertaining to DMCA agent designation cause Microsoft to lose DMCA safe harbor.  To the contrary, the evidence shows affirmatively that Microsoft met the agent designation requirements of subsection 512(c)(2).  The subsection demands only substantial compliance, not perfection.  It asks the provider to give "*substantially* the following information: (A) the name, address, phone number, and electronic mail address of the agent [and] (B) other contact information which the Register of Copyrights may deem appropriate."  17 U.S.C § 512(c)(2) (emphasis added).

At all times, Microsoft's statutorily required information on file was accurate. (Weston Dec. ¶ 2.)  P10 argues that Microsoft's clerical error of failing to update an obsolete fax number in one of two locations, Microsoft's alleged mishandling of

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

13

FedEx packages on two occasions, and Microsoft's non-receipt of several P10 email messages means Microsoft fails to meet the DMCA's *agent designation* requirements. P10's argument fails on the law and also because there are disputed facts.

First, as to the FedEx packages and emails, there is no evidence that Microsoft provided an invalid postal address or email address in its designation forms. To the contrary, P10's own evidence shows it successfully sent packages and emails to Microsoft's DMCA agent at the on-file addresses. (Zada Dec. ¶ 9.)   P10 and Microsoft even spent time in April of 2007 confirming that P10 could reach Microsoft's DMCA agent successfully by email without any problem. Microsoft disputes that P10 ever sent it emails before March of 2007. (Weston Dec. ¶ 14.) Microsoft's DMCA agent has received email correspondence at the designated email address from third parties on the very same days that P10 alleges to have sent its messages. (Weston Dec. ¶ 13.) If P10 regularly failed to reach Microsoft's DMCA agent, it would be anomalous in light of other complainants' success.

Second, the outdated fax number in one location does not disqualify Microsoft. Under the similar substantial compliance standard for whether a notification of claimed infringement proper identifies a claimant, one Court noted Congress's intent that mere technical errors would not compromise compliance, citing a similar situation: a phone number containing an outdated area code. "Nothing in the Act itself says how we should determine whether a notification includes substantially all the required information; both the Senate and House Reports, however, state the term means only that technical errors … such as misspelling a name or supplying an outdated area code will not render ineffective an otherwise complete § 512(c)(3)(A) notification. S. Rep. No. 105-190, at 47 (1998); H.R. Rep. No. 105-551 (II), at 56 (1998)." *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs.*, 351 F.3d 1229, 1236 (D.C. Cir. 2003).  The statute does not make any reference to needing a

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

fax number.[2]  Thus, Microsoft's outdated fax number in the Copyright Office filing, combined with the new, correct number at the DMCA notification section of its website, does not disqualify it from safe harbor.

P10's reliance on *Ellison v. Robertson*, 357 F.3d 1072, 1081 (9th Cir. 2004), is misplaced.  That case did not concern subsection 512(c)(2) compliance, but rather a proper repeat infringer policy under subsection 512(i).  Second, the case ruled that a jury could decide whether defendant's implementation was flawed.  Third, and more to the point, the problem in *Ellison* was vastly different: defendant AOL changed the DMCA agent email address so that emails to the old address fell "into a vacuum:" AOL did not close the old account or provide "notification that the e-mail address was inactive."  *Ellison*, 357 F.3d at 1080 (citing the district court's findings at 189 F.Supp.2d at 1057-58).  Here, P10 knew its faxes were not going through.  P10 could have called Microsoft's agent for help at her working telephone number—which was always correct—or it could have checked the Microsoft website, but it never once did so over a period of years, and instead it let the problem fester.  Microsoft's evidence shows that Microsoft did comply substantially with all DMCA agent designation requirements.  Summary judgment to P10 based on Microsoft's failure to designate a DMCA agent would be improper.

## C.   Microsoft Provides Evidence That P10's Communications were Deficient and That Microsoft Acted Expeditiously in Processing Them As Best it Could.

P10 next argues that, even if Microsoft meets the agent designation requirements, it loses safe harbor because undisputedly Microsoft failed expeditiously to respond to P10's purported DMCA notices.  There is a very live dispute, not only about whether Microsoft responded expeditiously, which it did, but also about whether Microsoft had to respond in the first place, because P10's notices were

---

[2] While a regulation at 37 C.F.R. § 201.38 does request service providers to include a fax number, the regulation does not condition safe harbor eligibility on the inclusion or omission of such information.

entirely deficient under the DMCA.

**1.    Microsoft Expeditiously Processed All Notices It Received.**

**a.    Microsoft Contests P10's Assertions That it Received Notices Dated Before March 26, 2007.**

For those communications that Microsoft's DMCA agent never received, Microsoft cannot lose safe harbor for any alleged infringements that those notices identified.  Whether Microsoft's DMCA agent ever received (and whether P10 ever sent) eleven email communications between October 25, 2004 and March 4, 2007 is a hotly disputed fact.  (Weston Dec. ¶ 14; LeClair Dec. ¶ 2.)  Weston's jkweston@microsoft.com address was functioning on all dates that P10 allegedly sent communications.  Weston does not delete email from that account.  She has no record she ever received the messages.  Notably, Microsoft is not the only search engine that has no record of communications Zada claims to have sent.  *See Perfect 10 v. Google,* Case No. CV04-9484 (C.D. Cal.), Docket No. 42 (Dec. of Macgillivray In Support of Google's Opposition to P10's Motion for Preliminary Injunction, attached as Ex. F to the Bridges Dec.)  Taking the facts in a light most favorable to Microsoft, the Court cannot grant summary judgment concerning loss of safe harbor related to the alleged infringements in these notices, or any notice Microsoft did not receive.[3]

**b.    Microsoft Diligently and Expeditiously Processed all Communications it Received.**

For those communications that Microsoft agrees its DMCA agent did receive, dated between March 26, 2007 and December 13, 2008, the evidence shows that Microsoft processed them expeditiously and appropriately, given their massive size, confusing organization, and many deficiencies.  When Microsoft could reasonably locate properly identified links to properly identified alleged infringements, Microsoft

---

[3] To the extent the Court does not view receipt as a disputed fact, and that fact is decisive for the Court, Microsoft renews its request for Rule 56(f) discovery to have a further opportunity to challenge Perfect 10's new, purported expert testimony of delivery.  (Bridges Decl., ¶ 9.)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   disabled those links.  Despite the unique complexity and unorthodox character of

2   P10's communications and the enormous volume of their attachments, Microsoft

3   continued to process the notices as soon as they came in.  Microsoft disabled pages

4   and pages of links.  Microsoft also explained why it could not satisfy all of P10's

5   demands.  (Weston Dec., ¶ 21, 26-27)

**2.    There is Evidence That P10's Communications Failed To
Comply With DMCA Notification Requirements, and for That
Reason Summary Judgment for P10 is Improper.**

9        Microsoft could lose safe harbor for failing to act on a notice expeditiously only

10  if the notice complied with the DMCA's requirements.  A service provider need not

11  make any response to communications that fail to comply with each requirement of

12  subsections 512(c)(3)(A)(ii), (iii), and (v).  17 U.S.C. § 512(c)(3)(B)(ii).  Any inaction

13  on such communications has no bearing on safe harbor.  And as P10 well knows, only

14  communications that meet subsection 512(c)(3)'s requirements can impart notice to a

15  service provider.  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007)

16  ("Since Perfect 10 did not provide effective notice, knowledge of infringement may

17  not be imputed to CCBill or CWIE"); *see also Perfect 10, Inc. v. Visa Intern. Service

18  Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007); 17 U.S.C. § 512(c)(3)(B)(i).  Both the

19  communications that Microsoft received and those it did not suffered from fatal

20  defects, or at least Microsoft raises a genuine issue as to compliance.

21       Compliance with § 512(c)(3) requires substantial compliance with *all* of the

22  requirements of § 512(c)(3)(A).  *CCBill*, 488 F.3d at 1112 ("The statute thus signals

23  that substantial compliance means substantial compliance with all of § 512(c)(3)'s

24  clauses, not just some of them.").  One crucial statutory requirement is that a

25  communication be  "*a* written communication."  *CCBill*, 488 F.3d at 1112 (citing

26  subsection 512(c)(3)(A)) (emphasis in the original).  The requirement is no "mere

27  technicality."  *Id.*  No service provider should have to spend "substantial time to piece

28  together the relevant information for each instance of claimed infringement."  *Id.*  In

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

17

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    *CCBill*, P10 could not demand that the defendant trudge through a spreadsheet to find

2    ownership information, then comb through some 20,000 pages of images to find an

3    alleged infringement, and then type a URL from the page into a browser to verify

4    P10's claim.  *Id.*  The Ninth Circuit reasoned that the "DMCA notification procedures

5    place the burden of policing copyright infringement—identifying the potentially

6    infringing material and adequately documenting infringement—*squarely on the*

7    *owners of the copyright.*"  *Id.*  The complainant must also identify the works allegedly

8    infringed.  17 U.S.C. § 512(c)(3)(A)(ii).  A claimant cannot merely state that allegedly

9    infringing material belongs to it.  It must "identify [the] copyrights themselves."

10   *CCBill*, 340 F. Supp. 2d at 1096.  One way to comply is to give the specific URL that

11   points to an infringing copy, so the service provider can compare the alleged

12   infringement to the claimed work.  *Id.*

13          Third, the complainant must identify "the reference or link, to material or

14   activity claimed to be infringing, that is to be removed or access to which is to be

15   disabled, and information reasonably sufficient to permit the service provider to locate

16   that reference or link."  17 U.S.C. §§ 512(d)(3), (c)(3)(A)(iii).  Thus, in *CCBill*, when

17   P10 only identified websites that "may contain more than one hundred images at

18   different URLs," its notices were deficient.  *Perfect 10, Inc. v. CCBill, LLC*, 340 F.

19   Supp. 2d 1077, 1089 (C.D. Cal. 2004).  P10 bears the "responsibility, under the

20   DMCA, to provide . . . enough information to . . . locate the infringing material."  *Id.*

21   at 1089-90.  Similarly, a URL to a "members only" area of a website is "not the URL

22   of the specific image within the 'members only' area of the website," and notice about

23   the "members only" homepage is not valid notice.  *Id.* at 1101.  Merely telling a

24   service provider that some infringement is going on at a particular site is insufficient

25   notice.  *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1090 (C.D. Cal. 2001).

26   Finally, subsection 512(c)(3) requires the complainant to provide notices "to the

27   designated agent."  The evidence shows that all of P10's communications, failed to

28   comply substantially with the DMCA's requirements for notification.

18

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

### a. *The Communications Microsoft Did Not Receive Were Deficient.*

P10's alleged but disputed communications dated October 25, 2004 through March 4, 2007, all suffer from similar defects that disqualify them as valid DMCA notices. All of these notices were "spreadsheet notices."  *See* Ex. 9 to the Zada Dec. P10 claims Microsoft neglected to process several URLs from these notices in Ex. 24 to the Zada Dec.  Each "spreadsheet notice" had a column for an allegedly infringing URL, a search term, and a location of the related P10 work.  The notices were defective in several ways.

First, overwhelmingly, the URLs were inadequate to exclude images from image search.  Almost every URL was a page URL, not an image URL.  Microsoft, like CCBill, had no way to know what was the infringing image on a page.  A page may have hundreds of images, most of which may not belong to P10.  (Weston Dec. ¶ 34.)  Moreover, in a number of cases, P10 provided incomplete URLs, with "ellipses" (…) to indicate missing material.  (*Id.* ¶ 33.)  For example, in its April 20, 2005 notice, four of the first seven URLs were incomplete and unintelligible.  Finally, the URLs, according to P10, omit any leading "www" even though P10 apparently intended that prefix.  P10 argues "www" should be assumed, but not all URLs start with "www."  For example, "ecf.cacd.uscourts.gov" will bring a web browser to this Court's filing system, but "www.cacd.uscourts.gov" leads to the Court's home page, which has completely different content; adding and deleting it from those URLs result in bad links.  (Bridges Dec., ¶ 5 and Exh. D.)  For the location of the P10 works all that P10 provided in most cases was a homepage such as "perfect10.com" or "amyweber.net" rather than a specific location.  In few instances, P10 provided a page reference to one of its magazines.  P10 did not include copies of P10's magazines.  Microsoft could not locate works P10 was claiming.  This deficiency compounded the problem Microsoft faced in identifying allegedly infringing works.  Thus, these "spreadsheet notices" failed to satisfy § (c)(3)(A)(ii) and (iii).  Also, by directing

19

Microsoft to whole websites and magazines outside of its possession, P10 incorporated huge swaths of material by reference, doing exactly what the Ninth Circuit in *CCBill* told P10 it could not do.

Therefore, even if undisputed facts showed that Microsoft received these notices – and they do not show this – P10 cannot disqualify Microsoft from DMCA safe harbor for failing to process the deficient notices through March 4, 2007.

**b.    *The Communications Microsoft Received Were Also Deficient.***

The later communications that Microsoft did receive were also deficient.  While Microsoft processed those notices, it could not and did not respond to every demand of P10.  For that, Microsoft does not lose safe harbor.

First, all communications after March 26, 2007 suffer the problems outlined in *CCBill*.  All referred to DVDs and even a hard disk drive, with thousands of files, some of them thousands of pages long, in complex directory structures.  These letter and disk combinations were hardly "a" communication.  *See CCBill*, 488 F.3d at 1112.  P10 attempted to impose on Microsoft a burden of wading through millions of pages of documents, including irrelevant ones, in search of alleged P10 infringements—exactly what *CCBill* foreclosed.  *CCBill* instructed complainants generally, and P10 specifically, that notices are deficient if they require a provider to spend substantial time piecing together each instance of claimed infringement, or if they require providers to parse through massive amounts of data to that end.  *Id.*  The volume of data from P10 in this case greatly exceeds the 20,000 pages at issue in *CCBill*.[4]  Rather than provide comprehensible data, P10 deluged Microsoft in exactly

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

---

[4] For example, the July 16, 2007 communication alone referenced a hard drive that contained, in addition to 1.1 million image files, a maze of folders and pdf files.  The communication also attached a DVD with 1,214 *files* in 378 folders and over 1.7 GB of data.  The disks accompanying the March 26, 2007 communication  contained about 7,000 files, many of which were lengthy pdfs.  The disks accompanying the June 7 and 8, 2007 communication contained over 21,000 *files*.  The disks accompanying the December 26, 2007 notice contained over 18,000 files, about 1,100 of which were pdfs, many with hundreds of pages.  The disks accompanying the June

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    the way *CCBill* forbade.

2         Second, to the extent P10 sought to give notice about Usenet sites (what P10

3    sometimes refers to as "paysites"), it failed.  It gave Microsoft the homepage URLs of

4    sites, e.g. "giganews.com," saying if Microsoft signed up for an account, it would see

5    that *some* content there infringed P10's rights.[5]  P10 demanded that Microsoft

6    completely stop listing Usenet websites in its search results.

7         By providing only the giganews.com home page link, P10 did not identify a

8    link to specific infringing material, and certainly no link from Microsoft to that

9    material.  Thus, P10 has not complied with 512(d)(3).  And the giganews.com

10   webpage and similar pages are only websites that "may contain more than one

11   hundred images at different URLs," or that are gateways to "members only" areas of

12   websites.  Both forms of notice are flawed under *CCBill*.  340 F. Supp. 2d at 1089-90,

13   1101.  Both are also flawed under *Hendrickson*, where notice of infringement "there

14   on that site" was deficient.  165 F. Supp. 2d at 1090.

15        Third, mere printouts of alleged infringements on third-party webpages, as in

16   Zada Dec. Ex. 25, were deficient for notice purposes.  The printouts did not tie alleged

17   infringements to Live Search; indeed sometimes they referred to *Google* results.

18   (Donaldson Dec. ¶ 3 & Ex. B.)  Moreover, stacks of third-party webpage printouts are

19   precisely the kind of notice *CCBill* rejected as too burdensome.

20        Fourth, to the extent P10 notified Microsoft about P10 passwords on web pages

21   or ads for Microsoft services appearing near copies of P10 images, neither incident

22   can result in a DMCA response and neither incident gives rise to Microsoft's liability.

23   Passwords are not copyrighted material to which Microsoft can disable a link.

24   *Google*, 416 F. Supp. 2d 828 at 438 n.9.  Microsoft ads appearing near a P10 image do

25   not implicate Microsoft's provision of search services.  Finally, the March 26, 2007

26   _____

     2, 2008 communication contained over 15,000 files, over 200 of which were pdfs,
27   many with hundreds of pages.  (Weston Dec. ¶32.)
     [5] Notably, giganews.com has designated its own DMCA agent with the U.S.
28   Copyright Office.  (Bridges Decl., ¶ 8 and Ex. G.)  P10 can send DMCA notices
     directly to Giganews, Inc.

and July 6, 2007 communications to Rubin and Gates were not DMCA notices at all. They did not ask for removals of particular links—they simply threatened litigation.

<b>c.     <i>Because No Notices Complied with the DMCA, Microsoft Maintains Safe Harbor.</i></b>

The evidence before the court, namely P10's communications themselves, establishes that P10 failed to comply with the DMCA's notification requirements.  As a result, none of its notices obligated Microsoft to take any action, and Microsoft maintains its safe harbor.  P10 had every opportunity to improve its communications. Microsoft offered to help.  P10 even has stated that it hired Attributor, third party to investigate and report on alleged infringements on Google and Yahoo!, providing reports that could have enabled P10 to give Microsoft improved notices.  P10 has never indicated that it commissioned such reports to send to Microsoft.  (Bridges Dec. ¶ 6 and Ex. E.)

<b>D.     Microsoft Needs No Repeat Infringer Policy for Live Search but Has The Requisite Policies in Place.</b>

P10's final argument to disqualify Microsoft from safe harbor is that Microsoft failed to adopt or reasonably implement a repeat infringer policy.  Subsection 512(i)(1)(A) conditions safe harbor on a "a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  A "service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications."  <i>CCBill</i>, 488 F.3d at 1109-10.  "An implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright."  <i>Id.</i>; <i>see also Perfect 10, Inc. v. Amazon.com, Inc.</i>, No. 05-4753-AHM, Slip Op. at 6 (C.D. Cal. Nov. 4, 2008) (hereinafter A9 DMCA Order).

P10 claims that Microsoft does not have a proper repeat infringer policy for

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

22

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  Live Search.  P10 is mistaken.  Live Search has no subscribers and account holders, so

2  therefore, there are no "appropriate" situations for terminations.  *Cf.* A9 DMCA Order

3  at 7 (assuming that A9's search engine had no subscribers or account holders).  There

4  is no way to prevent particular users from using the Live Search product.  It is

5  publicly available to all.  Thus, while Microsoft does have repeat infringer policies for

6  other products, it does not have one for Live Search.  (Tapa Dec., ¶ 11.)

7       P10's complaints about Microsoft continuing to do business with Usenet

8  websites that purchase AdCenter ads adjacent to search results (Mot. at 11), fail for

9  two reasons.  First, Microsoft *has* a policy that it can terminate advertisers who use the

10 AdCenter program for any reason, including for repeat infringement.  Both

11 Microsoft's specific statement in its Terms of Use that it can terminate repeat

12 infringers and its other policies that it can terminate for any unlawful conduct qualify

13 Microsoft as adopting a DMCA repeat infringer policy.  *Corbis Corporation v.*

14 *Amazon.com*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004).  Second, P10 presents no

15 evidence it would have been "appropriate" to terminate advertising relationships with

16 Usenet sites such as giganews.com.  As discussed, P10's notices regarding the Usenet

17 sites were woefully deficient.

18      Finally, although this Court need not address the matter, under the *CCBill* test,

19 Microsoft does have a working notification system, has a procedure for dealing with

20 DMCA-compliant notifications, and it does not actively prevent copyright owners

21 from collecting information needed to issue such notifications.  (Tapia Dec., ¶8.)

22      The totality of what Microsoft does for *all* complainants determines whether a

23 policy suffices.  *CCBill*, 488 F.3d at 1113.[6]  The evidence shows that whatever

24 problems P10 has experienced with Microsoft's process were unique to it.  No other

25 complainant has had as much trouble reaching Weston.  Others reached her by email

26 on the same days when P10 claims it sent its emails.  Others are willing to work with

27 ────────────

28 [6] The *CCBill* test makes little sense given the text of the statute, which talks in terms of repeat infringers; having a working notification system is already covered by subsections 512(c) and (d).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    Microsoft to find ways to stop infringement; P10, instead, has stubbornly cling to the

2    same deficiencies.  (Weston Dec., ¶ 4, 7.)

3        Weston has handled thousands of complaints for Microsoft over nearly a

4    decade.  She follows up on deficient complaints and processes those she can.  This

5    includes P10's complaints to the extent she received them.  P10 has reached her at the

6    mailing address and email address in Microsoft's agent designation, just as thousands

7    of other complainants have.  (*Id.* ¶ 18.)  Taking the evidence in a light most favorable

8    to Microsoft, the non-moving party, the Court cannot find on summary judgment that

9    Microsoft failed to satisfy the repeat infringer policy requirement of § 512(i)(1)(A).

10        **E.    There is At Least a Question of Fact As to Whether Microsoft**

11             **Qualifies for Section 512(a) Safe Harbor.**

12        P10 assumes that Microsoft can qualify for safe harbor only under subsection

13    512(c) or (d), safe harbors that require the service provider to designate an agent and

14    respond to notifications of claimed infringement.  While Microsoft's Live Search

15    qualifies under subsection (d) for information location tools, it also qualifies under

16    subsection (a), under which a service provider can maintain safe harbor without

17    responding to infringement complaints. *RIAA, Inc. v. Verizon Internet Servs., Inc.*,

18    351 F.3d 1229, 1234 (D.C. Cir. 2003).

19        Subsection 512(a) creates a safe harbor for service providers that are "providing

20    connections for[] material through a system or network controlled or operated by or

21    for the service provider."  There are five requirements: (1) someone other than the

22    provider initiates the transfer of the material; (2) the provision of connections is

23    automated and the provider does not select what is transmitted; (3) the provider does

24    not select the recipient; (4) the provider does not transiently store the material, except

25    as necessary for providing connections to it; and (5) the material is not modified.  17

26    U.S.C. § 512(a).  Microsoft meets all five requirements: (1) a third-party website

27    initiates the transfer of material; (2) Microsoft's search engine provides links, which

28    are connections, and it is automated and does not make content-based editorial choices

24

about what material to link; (3) anyone can be the recipient of the material that the link references; (4) Microsoft is not involved in the transfer of material from third-party to end user; and (5) the material is unchanged.  (Tapia Dec., ¶¶ 2-3.)  There is at least a question of fact that Microsoft qualifies for § 512(a) safe harbor requiring denial of this motion.

## IV.    CONCLUSION

Microsoft has a robust, decade-old process for handling complaints under the DMCA.  Thousands of complainants have successfully sent notices by email, mail, and fax to Microsoft's properly designated DMCA agent.  Any communication issues P10 experienced, if credible, were aberrations from an otherwise efficient process.  P10's convoluted, voluminous notices were unlike anything Microsoft has seen before or since, but Microsoft worked diligently to respond to them as best it could.  The evidence is compelling that Microsoft properly designated its agent, adopted and implemented all appropriate policies, and expeditiously processed P10's notices as appropriate.  The Court should deny P10's partial summary judgment motion to disqualify Microsoft from DMCA safe harbor.

Respectfully submitted,

Dated: February 23, 2009        WINSTON & STRAWN LLP

By:    /s/ - Andrew P. Bridges
Andrew P. Bridges
David E. Koropp  (pro hac vice forthcoming)
Jennifer A. Golinveaux
Matthew A. Scherb
Attorneys for Defendant
Microsoft Corporation

SF:237003.1

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802